**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

KRISTI ADMIRE                                        CIVIL ACTION

VERSUS                                               NO. 04-0579

RODNEY JACK STRAIN, ET AL.                           SECTION "K"

<u>ORDER AND OPINION</u>

Before the Court is the "Motion for Summary Judgment Pursuant to Rule 56(b) of Federal Rules of Civil Procedure" filed on behalf of defendants Rodney J. Strain, Jr., in his capacity as Sheriff of St. Tammany Parish; Marlin Peachey, in his capacity as Warden of the St. Tammany Parish Jail; and Scott Knight, in his capacity as Field Training Officer (FTO) Manager (Doc. 65). Having reviewed the pleadings, memoranda, and relevant law, the Court, for the reasons assigned, denies the motion for summary judgment in part and grants it in part.

BACKGROUND

Plaintiff Kristi Admire claims that she has been subjected to discriminatory treatment based on her gender; however, the specific manifestations of that discrimination are not entirely clear from the pleadings.  Ms. Admire's specific claims appear to be: 1) failure to promote, 2) disparate treatment with respect to promotion 3) disparate treatment with respect to disciplinary action, 4) discriminatory termination 5) retaliation for engaging in protected activities, and 6) discriminatory hostile work environment.

The St. Tammany Parish Sheriff Office (STPSO) employed Kristi Admire as a deputy assigned to the "8 to 4" prisoner-transportation section of the Corrections Division.  On May 28, 2002 Ms. Admire, while operating a STPSO transport van in which inmates were riding, executed

a traffic stop of a driver suspected of driving while intoxicated.  Following an investigation of that traffic stop, Captain Danny Jenkins, Ms. Admire's supervisor, determined that  in executing the traffic stop Ms. Admire violated several policies of the STPSO.  Captain Jenkins suspended Ms. Admire for ten days without pay and transferred her from the transport unit to the Jail, where she had previously been assigned.[1]  Marlin Peachey, the Warden of the St. Tammany Parish Jail, reviewed and approved of the disciplinary action taken against Ms. Admire.  Ms. Admire appealed the disciplinary action.  In a report issued August 15, 2002, the Administrative Review Board affirmed the disciplinary action, but reduced the suspension from duty to three days. Ms. Admire claims that she was punished more harshly because of her gender.

Thereafter, Ms. Admire applied for promotion within  in the Corrections Division six times; she was not selected for promotion on four of those attempts. She was however promoted to Corporal in March 2003 and to sergeant in November 2003.  She alleges that she was discriminated against because of her gender each time she was denied promotion.  Additionally, with respect to two of the denials of promotion Ms. Admire asserts that she was penalized because her  disciplinary action occurred within six months of her attempt at promotion  while  males who had a disciplinary action within six months of applying for a promotions were not similarly penalized.

After being promoted to corporal, Ms. Admire  filed a claim with the Equal Employment Opportunity Commission alleging that  she had been denied promotions and been disciplined more harshly because of gender based discrimination.

In 2004, Ms. Admire began training in the STPSO's Criminal Patrol training program.  In 2005 she was terminated from the program.  Ms. Admire contends that the male supervisors and

---

[1] The Jail is also part of the Corrections Division of the STPSO.

training officers in the program were, because of her gender,  unduly harsh to her and failed to offer her the same access to remedial training and  transfer options for training officers that were offered to male candidates.  Lastly, Ms. Admire alleges that she was terminated in retaliation for "having filed the EEOC charges of discrimination, for having filed a federal lawsuit, for having made numerous challenges to the defendant's policies, and because she was considered to be a problem for the department."

SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure provide that summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Stults v. Conoco, Inc.*, 76 F.3d 651, 655-56 (5th Cir.1996) (*citing Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 912-13 (5th Cir.1992) *(quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)), cert. denied, 506 U.S. 832 (1992)). When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. The nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis supplied); *Tubacex, Inc. v. M/V RISAN*, 45 F.3d 951, 954 (5th Cir.1995).

Thus, where the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 588. Finally, the Court notes that substantive law determines the materiality of facts and only "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248. 106 S.Ct. 2505, 2510, 91. L.Ed. 2d 202 (1986).

In deciding a motion for summary judgment, the Court must avoid a "trial on affidavits." "Credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts" are matters to be determined by the trier-of-fact. *Id.*, at 255,  106 S.Ct. at 2513.

## LAW AND ANALYSIS

Plaintiff brings her claims under two federal statutes, Title VII of the Civil Rights of 1964 and 42 U.S.C. §1983.  Title VII prohibits employers from discriminating  against employees on a number of grounds, including gender.  42 U.S.C, §2000e -2(a)(1).     Title 42 U.S.C. §1983 establishes a cause of action against any person who under color of law deprives an individual of a constitutional right.

Plaintiff may establish gender discrimination under Title VII through either direct or circumstantial evidence.  *See Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004). **The nature of the evidence determines the  framework to be used  in analyzing the plaintiff's claim.  *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 621-22, 83 L.Ed.2d 523 (U.S. 1985).**

It is axiomatic that  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),  establishes the procedural framework for analyzing motions for summary judgment in cases involving claims under Title VII which rely on circumstantial evidence

of intentional discrimination.  The same test applies in evaluating defendants' motion for summary judgment with respect to plaintiff's discrimination claims under 42 U.S.C. §1983.  *Patel v. Midland Memorial Hospital and Medical Center*, 298 F.3d 333, 342 (5th Cir. 2002). Under the *McDonnell Douglas* framework, plaintiff must first establish a genuine issue of material fact as to each element of a *prima facie* case of discrimination.  *Willis v. Coca Cola Enterprises, Inc.*, 445 F.3d 413, 420 (5th Cir. 2006).  To establish a prima facie case, the plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) that the position was filled by someone outside of the protected class or that others outside the protected class who were similarly situated were more favorably treated.  *Ross v. University of Texas at San Antonio*, 139 F.3d 521, 526 (5th Cir. 1998).  Once a plaintiff establishes a *prima facie* case of discrimination, a presumption of discrimination arises and the burden shifts to the defendant employer to produce a legitimate, non-discriminatory reason for the challenged action.   After the defendant employer satisfies its burden of producing a legitimate, non-discriminatory reason for the challenged actions, the burden returns to the plaintiff to raise a genuine issue of material fact that the non-discriminatory reason offered by the defendant is merely pretextual.  *Willis v. Coca Cola Enterprises, Inc.*, 445 F.3d at 420.

Despite the intermediate evidentiary burdens shifting back and forth under the *McDonnell Douglas* framework, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)(internal quotation and citation omitted).  Therefore, the plaintiff must produce substantial evidence of pretext to survive a motion for summary judgment.  *Auguster v. Vermilion Parish*

*School Board*, 249 F.3d 400, 402-403 (5th Cir. 2001).   "Evidence that the proffered reason is unworthy of credence must be enough to support a reasonable inference that the proffered reason is false; a mere shadow of doubt is insufficient.   *Id.* at 403.  A plaintiff may meet the burden of demonstrating pretext and thus prevail on  a motion for summary judgment "if the evidence taken as a whole (1) creates a fact issue as to whether each of the employer's stated reasons was what actually motivated the employer and (2) creates a reasonable inference that [the protected status of the plaintiff] was a determinative factor in the actions of which plaintiff complains." *Vadie v. Mississippi State University*, 218 F.3d 365,  374, n.23 (5th Cir. 2000).  A plaintiff's subjective belief that she was the victim of intentional discrimination is insufficient to create an inference of discriminatory intent.  *Roberson v. Alltel Information Services*, 373 F.3d 647, 654 (5th Cir. 2004).

**Where the plaintiff produces direct evidence of discrimination, the *McDonnell -Douglas* framework is "inapplicable." *Trans World Airlines, Inc. v. Thurston*, 490 U.S. at 119, 105 S.Ct. at 621.  the analytical framework of *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) applies.  "[U]nder *Price Waterhouse*, once the plaintiff presents  direct evidence of discrimination, the burden of proof shifts to the employer to show that the same adverse employment decision would have been made regardless of discriminatory animus.  If the employer fails to carry this burden, plaintiff prevails." *Mooney v. Aramco Services, Co.*, 54 F.3d 1207, 1217 (5th Cir. 1995).**

### A.  Claims for Discriminatory  Denial of Promotion

Plaintiff contends that the first two times she applied for promotion to corporal and the first two times that she applied for promotion to sergeant, she was denied promotion  because of her gender.  The facts pertinent to Ms. Admire's first three promotion efforts are summarized below:

- July 26, 2002  Corporal Promotion Board - Three women, including plaintiff, and four men applied for the two vacant corporal positions.   Kelly McGill, a female, and Greg Burnthorn, a male, received the promotions.  Plaintiff scored 1% higher on the Corporal test than did Greg Burnthorn. This Promotion Board occurred within six months of Ms. Admire's adverse disciplinary action.
- November 6, 2002 Corporal Promotion Board - On the promotion  test William Frosch scored 90%, Chase Hudson scored 88%, and Ms. Admire scored 86%.  William Frosch and Chase Hudson, both males, were selected. This Promotion Board occurred within six months of Ms. Admire's adverse disciplinary action.
- November 6, 2002 Sergeant Promotion Board - Corporal Greg Burnthorn and Ms. Admire both scored 70% on the test.  Corporal Burnthorn, a male, received the promotion.

In connection with her claim of failure to promote, plaintiff offers Marlin Peachey's statement that "women don't belong in law enforcement" as evidence of gender discrimination. Doc. 147-8, p. 149. To establish that comments in the workplace provide sufficient evidence of discrimination, they must be 1) related to the protected class of persons of which plaintiff is a member;  2) proximate in time to the adverse employment action; 3) made by an individual with authority over the employment at issue, and 4) related to the employment decision.  *See Krystek v. University of Southern Mississippi*, 164 F.3d 251, 256 (5th Cir. 1999)(citing *Brown v. CSC Login Inc.*, 82 F.3d 651, 655 (5th Cir. 1996). Only statements demonstrating discriminatory animus in the decisional process may be sufficient to qualify as direct evidence of discrimination.  *See Mooney v. Aramco*, 54 F.3d 1207, 1217, n. 12 (5th Cir. 1995)(*abrogated on other grounds Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004).  Direct evidence is "evidence which, if believed proves the fact of discriminatory animus without interference or presumption." *Sandstad v. CP Richard Ellis*, *Inc.*, 309 F.3d 893, 897 (5th Cir. 2002).

7

**Marlin Peachey's statement does not constitute direct evidence of discrimination. Plaintiff has not offered any evidence addressing when Marlin Peachey made the statement. Thus, there is an issue of fact as to whether the statement was proximate in time to the denial of promotion. However, even assuming *arguendo* that the comment was proximate in time to plaintiff's denial of promotion, the statement is not related to the promotion decision. Plaintiff was already in law enforcement at the time Marlin Peachey made the statement. If plaintiff's claim was one for failure to hire, the comment might well be direct evidence of discrimination; however, in the context of a failure to promote claim the statement does not qualify as direct evidence. Because plaintiff has offered no direct evidence of gender discrimination, the *McDonnell Douglas* analysis applies.**

With respect to the July 26, 2002 Promotion Board and the two November 6, 2002 Promotion Boards, there is no serious dispute that Ms. Admire established her *prima facie* case. She is a woman; she was qualified for the positions sought; she did not receive the promotion; and in each case a man received the promotion. However, with respect to each of those three Promotion Boards, defendants have proffered a legitimate nondiscriminatory explanation for selecting a candidate other than Ms. Admire. Defendants submitted the affidavit of Marlin Peachey to establish the procedure used to select the individual to be promoted. It states, in pertinent part, that:

> The result of the written test constituted one-half of the total score, with the other half coming from factors such as seniority, previous job performance, assessment of leadership ability, the promotions board interview, and whether the applicant had served as a training officer for new hires.
>
> Typically, the person or persons (depending upon the number of vacancies) who received the highest total score(s) received the promotion(s).

8

> But, as ranking officer and overall supervisor of the Corrections
> Division, he retained from Sheriff Strain an element of discretion
> over the final decision when the total scores were tied or very close,
> or when there was some other relevant job-performance standard.

Doc. 65-5, Exhibit B.  With respect to the July 26, 2006 Promotion Board, Marlin Peachey's

affidavit states:

> Dy. Burnthorn was selected instead of Ms. Admire, despite her one-
> percentage-point-higher score on the test, because the Board took
> place within six months of the adverse disciplinary action against Ms.
> Admire . . ., and because Dy. Burnthorn had seniority over Ms.
> Admire within the Corrections Division and because he had an edge
> in job performance (he had been a previous Employee of the Month
> in the Corrections Division).

For the November 6, 2006 Corporal Promotion Board, defendants produced evidence

establishing that Ms. Admire was not selected for one of the two vacancies because she received

the third highest test score.

To explain why Greg Burnthorn received the promotion to sergeant over Ms. Admire by

the November 6, 2006 Sergeant Promotion Board, defendants again rely on the affidavit of Marlin

Peachey.  It states:

> Cp. Burnthorn was selected for the position ahead of Ms. Admire,
> despite their tied scores, because he had more length in service, no
> disciplinary marks on his record, and he had served as a field training
> officer, which Ms. Admire had not.  In addition, Cp. Burnthorn was
> already a Corporal, while Ms. Admire was still at a rank of Deputy.

*Id.*

Seniority and a difference in performance level are legitimate nondiscriminatory factors for

hiring one candidate over another.  *Sessions v. Rush State Hospital*, 648 F.2d 1066, 1070 (5th Cir.

1981);  *See also Pittman v. Hattiesburg Municipal Separate School District,* 644 F.2d 1071, 1074

(5th Cir. 1981). Additionally, an adverse disciplinary event is a nondiscriminatory component of job

performance which may be considered in selecting an employee for promotion.

Defendants offered considerable evidence establishing that during the relevant time period, i.e., June 2002 - March 2003, six of the ten employees promoted to corporal in the the Corrections Division of the STPSO were female, and two of the four employees promoted to sergeant were female. Doc. 65-5, Defendant's Exhibit A, Defendant's Exhibit B. Because defendants have satisfied their burden of establishing a legitimate nondiscriminatory reason for not promoting plaintiff, the burden shifts back to the plaintiff to raise a genuine issue of material fact that the non-discriminatory reasons offered by defendant for not hiring plaintiff are merely pretextual.

Plaintiff cites several statements by Marlin Peachey, in addition to his statement that women don't belong in law enforcement" as evidence that the reasons stated by defendants for failing to promote her are pretextual. Ms. Admire offers evidence that Marlin Peachey "wanted to get rid of" her and that after learning that she had been accepted to the Field Training Officer program he said "[g]ood. She won't be here at the jail no more. She won't be my problem anymore, and they can get rid of her on the road." Doc. 74-4, p. 97. Additionally, plaintiff submits evidence that Marlin Peachey stated that "he didn't want Kristi to be a corporal" and that he wanted Ms. Admire to be videotaped exiting the building. Doc. 74-4, p. 95. **Only one of Marlin Peachey's statements, i.e. "women don't belong in law enforcement," is linked to plaintiff's gender. Although that comment is not specific to promoting women, the issue involved herein, it is reasonable to infer discriminatory animus from the statement in connection with the July 26th corporal promotion board when the statement is considered together with undisputed evidence that Marlin Peachey was a member of that promotion board and ordered the destruction of the promotion tests for the July 26 promotion board. Katherine Brooks, a STPSO employee who sat on the**

July 2002 Corporal Promotion Board, provided evidence establishing  that Marlin Peachey ordered the destruction of the July 2002 promotion board tests.  In an affidavit, Ms. Brooks stated that "pursuant to an order received from Warden Peachey, she shredded the test results associated with the July 2002 promotion board," and that "Warden Peachey communicated to her at that time his intention that no one else know of Ms. Admire achieving one of the higher scores on the test and not receiving the promotion." Doc. 67-7.  In her deposition Ms. Brooks testified that Marlin Peachey directed that  the test sheets of the candidates who applied to that promotion board be shredded because "he didn't want anybody to know that Kristi had scored the highest."  Doc. 74-4, pgs. 24, 94.   Discriminatory animus can be reasonably inferred  from the shredding of the promotion tests where, as here,  there is undisputed evidence that there was no policy mandating the shredding of promotion tests. Katherine Brooks testified that she had never been asked to shred promotion tests before that time, nor has she been asked to shred promotion documents since that time.  Doc. 74-4, p.24. With respect to the July 26, 2002 promotion board, the Court concludes that plaintiff has offered substantial evidence of pretext, which creates a fact issue as to whether defendants' stated reasons for not promoting her are what actually motivated the failure to promote her and creates a reasonable inference that her gender was a determinative factor in the failure to promote her.  Therefore, defendants' motion for summary judgment is denied with respect to that claim.

However, with respect to the denial of promotion by the two November 2002 promotion boards plaintiff has not produced substantial evidence of pretext.  The  only evidence of pretext offered with respect to those two claims are the cited statements by Marlin Peachey, only one of

which, as noted before, references plaintiff's gender, and none of which reference promotion. Those statements are insufficient to support a reasonable inference that defendants' proffered reasons for failing to promote plaintiff in either of her November 2002 attempts at promotion are false. Therfore, the Court grants defendants' motion for summary judgment with respect to the two November 2002 promotion boards and denied the motion with respect to the July 26, 2002 promotion board.

Plaintiff also urges that the defendants discriminated against her based on her gender when she asked to be considered for a vacant sergeant's position in March 2003.  Ms. Admire submitted a request to be considered for the vacant sergeant's position;  however, she was apparently not considered for the position.  Ms. Admire alleges, and for purposes of this motion the Court accepts, that Captain Bennett advised her that she was not qualified for the position because an applicant had to be a corporal to be eligible for the position.

To establish that she was, in fact, qualified for the sergeant's position Ms. Admire submits the announcement of the job vacancy.  The announcement does not list a rank of corporal as a requirement for the position.  Moreover, defendants do not urge that Ms. Admire was not qualified for the position.  Nor do they offer any legitimate non-discriminatory reason for failing to consider her for the position or for failing to promote her in February 23, 2003.  Having failed to present evidence setting forth a legitimate  non-discriminatory reason for not considering plaintiff for the vacancy or for failing to promote her at that time,  defendants are not entitled to summary judgment on that claim.

### 1) Disparate Treatment Analysis With Respect to Promotion

Additionally, Ms. Admire claims that she was subjected to disparate treatment in connection

with the denial of promotion to corporal in July 2002 because she was penalized for having had an adverse disciplinary action within six months of seeking to be promoted while others who had also been disciplined within six months of seeking promotion were not so penalized.    To establish a *prima facie* case of disparate treatment the plaintiff must demonstrate that: 1) she is a member of a protected class; 2) she was qualified for the position; 3) she suffered an adverse employment action; and 4) others outside the class who were similarly situated were treated more favorably.  *Okoye v. University of Texas Houston Health Science Center*, 245 F.3d 507, 512-13 (5th Cir. 2001).  As noted herein above in connection with the denial of promotion claim, there is no dispute that Ms. Admire has established the first three prongs of the *prima facie* test with respect to the July 2002 promotion board.

The final prong requires that Ms. Admire establish that there were other individuals who were disciplined within six months of seeking promotion who were not penalized in the promotion process for  the disciplinary action. Katherine Brooks testified that David Hansen received a promotion  to lieutenant  within six months of a receiving a disciplinary action.  Doc. 74-4, p. 41.

Defendants assert that David Hansen is not "similarly situated" to Ms. Admire because he was "appointed" to be a lieutenant, not "promoted."   Defendants offer considerable evidence addressing the differences between being "promoted" to corporal and being "appointed" lieutenant. The affidavit of Donna Schelsinger, a captain with the STPSO and the director of the STPSO's Human Resource Department states:

- She has been employed by Rodney J. Strain, Jr., Sheriff of St. Tammany Parish and the STPSO since 1997.
- "During her entire tenure with Sheriff Strain, the STPSO has distinguished between *promotion* and *appointment* in its policy, procedure & practices regarding advancement of rank."

- Above the basic rank of deputy "only the positions of Corporal and Sergeant are open for *promotion*; all positions of Lieutenant and above are *appointed* exclusively by Sheriff Strain himself."
- "[T]here is no written examination connected with the *appointment* of Lieutenants and above; these ranks are filled by Sheriff Strain's personal evaluation of possible candidates.
- "Also during her entire period of employment with Sheriff Strain, it has been a standing policy and practice that any adverse disciplinary action taken against an employee results in a six-month probationary period, during which time the disciplined employee cannot be promoted, meaning the policy only applies regarding advancement to the ranks of Corporal and Sergeant. The policy does not apply to the ranks of Lieutenant and above, since these involve appointment rather than promotion . . .."

Doc. 65-5, Defendant's Exhibit A. The affidavit of Jay Trainor, STPSO's Chief Deputy since 1997, describes the same distinction between *promotion* and *appointment* and the same policy, procedure and practice of placing employees who receive an adverse disciplinary action on a six-month probationary period, during which the employee may not be *promoted.* Doc. 65-6, Defendant's Exhibit F.

The only evidence offered by plaintiff to dispute the cited affidavits is her own affidavit stating, in pertinent part:

- "I contacted Tony Romano, the policy and procedure coordinator for the department regarding this policy regarding disciplinary actions preventing promotion and Romano informed me that there was no written policy regarding the matter and that I had every reason to expect that if I merited the promotion I would receive it."
- I looked in the policy and procedure manual . . . and I could not find any reference to the policy regarding disciplinary action as bar to promotion below lieutenant . . .."

These statements do not suffice to raise a genuine issue of material fact concerning whether there is a policy or practice regarding whether employees who have been disciplined may be *promoted*

14

within six months of being disciplined.  There is no requirement that every policy must be in writing.

Defendants have established that David Hansen is not similarly situated to plaintiff.  Because plaintiff offers no evidence showing that  others outside the protected class who were similarly situated to her were treated more favorably than she was treated with respect to being *promoted* within six months of having been disciplined, defendants are entitled to summary judgment on plaintiff's claim of disparate treatment with respect to her failure to be promoted in July 2002.[2]

### 2) Claim for Pattern and Practice of Discrimination in Promotion

In her second amended complaint plaintiff alleges that "defendants have a pattern and practice of gender based discrimination in training and promotion of females.  It is well established that "[a] pattern or practice case is not a separate and free-standing cause of action . . . but is really merely another method by which disparate treatment can be shown."  *Celestine v. Petroleos De Venezuella SA*, 266 F.3d 343, 355 (5th Cir. 2001).  Thus, to the extent that plaintiff to assert a separate claim for defendants' alleged pattern and practice of gender based discrimination with respect to training a promotion of women,  the Court dismisses that claim.

Moreover, the "pattern or practice" method of proof is not available in suits which are private, non-class action lawsuits.  *Frank v. Xerox Corporation*, 347 F.3d 130, 136 (5th Cir. 2003); *See Celestine v. Petroleos De Venezuella SA*, 266 F.3d at 355-56.

### B) Claims of Discriminatory Discipline

Plaintiff claims that because of her gender she was disciplined more harshly  for making a

---

[2] It is unclear from plaintiff's pleadings and her memoranda filed in opposition to defendants' motion for summary judgment whether she  asserts a similar disparate treatment claim with respect to her failures to be promoted to corporal and sergeant in November 2003.  To the extent that plaintiff alleges such claims, the Court's reasoning is equally applicable, and defendants are entitled to summary judgment on those claims as well.

prohibited traffic stop than male deputies who executed  prohibited traffic stops.  Ms. Admire fails

to establish a *prima facie* case with regard to this claim.  She has not produced any competent Rule

56 evidence to show that anyone who engaged in similar misconduct was  treated more favorably.

To demonstrate that she was disciplined more harshly than male deputies  who executed

improper stops,  plaintiff relies upon  an unauthenticated email dated June 3, 2002, purportedly sent

by Marlin Peachey to guards and administrative personnel at the St. Tammany Parish Jail which

states, in pertinent part:

> It has been brought to my attention that a number of traffic stops have
> been made by several deputies in the last couple of weeks.  Under no
> circumstances should a deputy make a traffic stop who is not POST
> Level 1 certified and has successfully passed training in the proper
> procedures of traffic and felony stops.  Even POST Level 1 certified
> deputies should never make traffic stops with inmates in their
> custody.
>
> . . .
>
> Any future occurrences will result in disciplinary action.

Doc. 67-15, p.1.  This unauthenticated document is insufficient to establish that the fourth prong of

the  plaintiff's *prima facie* case.  The document, even if property authenticated, does not identify

specific members outside plaintiff's protected class who were similarly situated and treated more

favorably than plaintiff.  Nor has plaintiff identified any male deputies who were treated more

favorably than she with respect to discipline following an unauthorized traffic stop.  Accordingly,

the Court grants defendants' motion for summary judgment with respect to this claim.

### C) Claims of Discriminatory Termination

Pursuant to Ms. Admire's request, the STPSO transferred her from the Corrections Division

to the District II Criminal Patrol Division in October 24, 2004, and she became a participant in the

Field Training Officer ("FTO") Program.   The FTO Program is the vehicle the STPSO, Criminal

Patrol Division uses to train deputies in that division, commonly known as "road deputies."   The

stated purpose of the program is "to ensure that the most highly trained and knowledgeable deputies

are placed in the Criminal Patrol Division."   Doc. 65-6, Defendant's Exhibit I, p. 1. "Defendants'

Statement of Uncontested Material Facts to Which there is No Genuine Issue To be Tried in Support

of Defendant's Motion for Summary Judgment" No. 17 succinctly describes the FTO Program as

follows:[3]

> The STPSO's FTO program, like similar programs employed by law-
> enforcement agencies across the country, provides "hands-on"
> training geared to qualify deputies for service in the department's
> criminal patrol divisions.   The FTO program consists of four phases
> of in service training and assessment.   During each phase, the trainee
> is mentored by a different Field Training Officer and scored on
> various tasks.   These Field Training Officers are all experienced
> "road deputies" who are specially selected for participation in the
> program.   The scores are logged onto a form called a Daily
> Observation Report ("DOR").   To successfully complete the
> program, the trainee must consistently score 4 or better on a scale
> from 1 (lowest) to 7 (highest) in each category. Termination from the
> program can be recommended in any of the four phases.   The trainee
> is responsible for learning applicable policy and procedure for each
> phase.
>
> ■   Phase I is an orientation time, called Limbo, during which the
>     trainee rides along with the deputy assigned to his or her
>     Field Training Officer and strictly observes.   DORs and
>     weekly evaluations are written up by the FTO, but they do not
>     count against a trainee during this time.
> ■   Phases II and III, which are both teaching periods, do count
>     in the trainee's overall assessment.   The trainee must pass
>     written and field performance tests in these phases in order to

---

[3] "Plaintiff's Statement of Contested Facts" states "Defendants Uncontested Material
Fact Number 17 was almost not contested until the very last sentence on the page and a half
assertion of fact."   The Court has not included the disputed "last sentence," but deems the
remainder of No. 17 to be uncontested.

move forward. Remedial training can be provided in each of these phases if a trainee fails to pass the Phase II and III tests the first time.

- ■ Phase IV consists strictly of evaluations of the trainee's performance on his or her own, with little or no instruction. In Phase IV, a trainee must consistently score a 4 or better in each category. Remedial training typically is not an option during this last phase, and officer safety is of paramount concern.

- ■ Officer Safety Violations are written documentation of deviation from officer safety rules and policies. If a trainee has repeated safety violations, termination from the program is mandatory.

Deputy Donnie Pallisor, a male, worked with  Ms. Admire during Phase 1 of the FTO program.  There is no evidence that Ms. Admire encountered any difficult during Phase I, and she progressed to Phase II.

During Phase II Deputy Mike Palazzo, a male, served as Ms. Admire's FTO trainer. During Phase II Deputy Palazzo cited plaintiff with three Officer Safety Violations. Doc. 65-10. On Weekly Evaluation Reports Deputy Palazzo made the following comments concerning Ms. Admire's "Least Acceptable Performance During Rating Period:

- "Dy Admire's officer safety was an issue during this week of evaluation, of which was documented on an officer violation form." Doc. 65-8, Defendant's Exhibit M, Report No. 3.
- "Dy Admire's officer safety was an issue during this week of evaluation, of which was documented on an officer violation form. Refer to violation for details." Doc. 65-8, Defendant's Exhibit M, Report No. 4.
- "Dy Admire's general safety as well as safety with suspects still needs improvement." Doc. 65-8, Defendant's Exhibit M, Report No. 2
- "Dy. Admire's officer safety is improving, with training and practical application.  Refer to officer violation from [sic] for detailed description."  Doc. 65-8, Defendant's Exhibit M, Report No. 5.

Additionally, on DORs Deputy Palazzo made the following comments concerning plaintiff's

18

performance:

- "Deputy Admire escorted the arrestee to the patrol unit with out having patted the suspect down or searched the subject. As Deputy Admire opened the rear door to place the suspect inside, Deputy Palazzo had to halt Deputy Admires actions and instruct Deputy Admire to conduct a search of the arrestee. Doc. 65-8, Defendant's Exhibit M, D.O.R. #9.

- "Deputy Admire arrested a subject for an aggravated burglary and neglected to search the subject prior to placing the subject in the rear seat of the patrol unit.  Deputy Admire responded to a disturbance on Rainey Dr., and allowed a suspect that was being interviewed to stand with his hands in his pockets. Doc. 65-8, Defendant's Exhibit M, D.O.R. #9.

- "Dy Admire had arrested several subjects and transported them to the jail for booking, in doing so, secured her weapon in the unit accordingly.  However, after leaving the jail, Dy Admire neglected to re-holster her weapon and went into a convenience store to get a drink, with several subjects inside, one of whom was known to both Dy Admire and FTO from previous encounters.  Dy Admire made it know to FTO upon her return to the vehicle that her weapon was still on the floor board."  Doc. 65-8, Defendant's Exhibit M, D.O.R. #10.

- "Dy Admire's vehicle placement was not condusive [sic] for a safe environment.  Dy Admire remained seated in the unit, calling in the traffic stop as the subject exited the vehicle, FTO exited the unit and halted the suspects approachment." Doc. 65-8, Defendant's Exhibit M, D.O.R. #11.

- "Dy Admire's vehicle placement and performance during a traffic stop displayed unsafe conditions, which will require remedial training."  Doc. 65-8, Defendant's Exhibit M, D.O.R. #11.

- "Dy Admires officer safety has improved.  However Dy Admire did not clear the back seat of the patrol unit." Doc. 65-8, Defendant's Exhibit M, D.O.R. #12.

- "Dy Admires officer is improving, in regards to keeps suspects hands out of their pockets, and pat downs.  However, Dy Admire was advised by FTO not to hold objects in her 'gun hand', example flashlight, clipboard.  Doc. 65-8, Defendant's Exhibit M, D.O.R. #12.

- "Dy Admire arrested a subject at his residence on outstanding warrants.  The arrestee did not have shoes on, so Dy Admire sat the subject on the couch and went to assist him with putting on his shoes.  However, in doing so, Dy Admire

leaned down, placing the shoe on his foot, exposing her face and upper body to the possibility of being kicked, if the arrestee had so desired to do so.   After transporting the subject to the jail, Dy Admire neglected to clear the back seat after the arrestee was removed from the vehicle."  Doc. 65-8, Defendant's Exhibit M, D.O.R. # 15.

- "Dy Admire conducted a stop on a 107 subject, that appeared to have a weapon on his person.  Dy Admire conducted initiated contact with the subject and began to check the subject for warrants.  Although the subject was not found to have a weapon on his person, Dy Admire did not conduct a pat down on the subject, who was suspected to have one.  A pat down of the subject was conducted by the FTO."  Doc. 65-8, Defendant's Exhibit M, D.O.R. #19.

- "Dy Admire allowed the subject to stray away from her position and the subject walked to the residence, by the front door.   The FTO stopped the subject from entering the residence and escorted him back to the vehicles."  Doc. 65-8, Defendant's Exhibit M, D.O.R. #20.

On November 11, 2004, Deputy Palazzo documented an officer safety violations committed by Ms.

Admire stating:

> "Dy Admire was unable to check the rear seat of patrol unit prior to the beginning of the shift due to responding to a call, and did not take the time after the completion of the call to conduct the search.  After arresting a suspect for an aggravated battery, Dy Admire neglected to conduct a search of the back seat after the suspect was transported to the jail.
>
> After arresting the subject for an aggravated battery, [Admire] neglected to search the subject prior to placing the subject in the rear seat of the patrol unit.  Dy Admire also responded to a disturbance on Rainey Dr. and allowed a subject that was being interviewed to stand with his hands in his pockets.

Doc. 65-10, Defendant's Exhibit N.  On  November 15, 2004 Deputy Palazzo documented an officer

safety violation stemming from Ms. Admire failure to retrieve her weapon from the floorboard of

her patrol unit.  Doc. 65-10, Defendant's Exhibit N.

Deputy Palazzo noted two additional officer safety violations on November 25, 2004 stating:

20

> Dy Admire arrested a subject on outstanding warrants, transported the subject to the jail after which neglected to check/clear the back seat.
>
> Upon making the arrest, Dy Admire observed that the subject was not wearing shoes. Dy Admire sat the subject on the couch and assisted the subject with putting his shoes on. However, in doing so, Dy Admire . . . down, placing the shoe on his foot, this exposing her face and upper body to the possibility of being kicked, if the arrestee so desired.

Doc. 65-10, Defendant's N. Ms. Admire disputed the back seat violation stating that she did clear the back seat while Deputy Palazzo was inside a building. *Id.*

On November 16, 2004, Ms. Admire participated in an FTO Team Evaluation with Deputy Palazzo, Corporal Keith Schenck, Lieutenant Pat McLaney, and Captain Jimmy Estes. Deputy Palazzo prepared the evaluation for the meeting; it stated that Ms. Admire had significant strengths with respect to "good organizational skills in reference to report writing," "a strong base knowledge of criminal and traffic statutes," and that she "is developing a good working rapor [sic] with other members of her shift." Doc. 65-10, Defendant's Exhibit P. Deputy Palazzo evaluated Ms. Admire's officer safety as her "primary weakness." *Id.* The evaluation form indicated that Deputy Admire was to receive "remedial training as it pertains to Recent Officer Safety Concerns" on November 16. Additionally, at the meeting

> Deputy Admire was advised of the repercussions of any subsequent repeated officer safety violations. Dy Admire was presented with the option of a change in field training officers as well as the option to transfer laterally in the department. Ms. Admire elected to remain with FTO Palazzo and continue with the FTO program.

Doc. 65-10, Defendant's Exhibit P. Despite the Deputy Palazzo's notation that Ms. Admire needed remedial training in connection with making traffic stops, Ms. Admire denies that remedial training was provided to her in Phase II. Ms. Admire successfully completed Phase II.

21

In Phase III Deputy Bobby Golden, a male, served as Ms. Admire's field training officer. On December 14, 2004, Deputy Golden documented the following concerning Ms. Admire's performance:

> While conducting a stop on two suspicious subjects in a high crime/narcotics area, Dy Admire completed a thourough [sic] pat down search of the subjects.  Upon locating two crack rocks in one of the subjects front shirt pocket, Dy Admire, while standing behind the subject, placed her head below his arm and around his side in an attempt to view the object in his pocket.  This caused a potential officer safety issue.  However, the pat down search was thourough [sic] and every other aspect of the officer safety was performed at or above the minimum acceptable level.

Doc. 65-8, Defendant's Exhibit M, D.O.R. #25.  Deputy Golden also noted:

> During the course of the day, Dy Admire made several traffic stops on different vehicles.  Dy. Admire approached all of the vehicles to begin the investigation.  Dy Admire maintained a tactically safe position while interviewing the drivers, ensuring that she stopped at the rear of the Drivers window, never placing herself directly in front of the window.  Dy Admire maintained a safe position when returning to the rear of the vehicle to conduct warrants checks and/or issue citations.

Doc. 65-8, Defendant's Exhibit M, D.O.R. #26.  Ms. Admire successfully completed her Phase III training. Following completion of the Phase III training, Ms. Admire was sent to the P.O.S.T. Level One training program at the Slidell Police Academy.  Ms. Admire  successfully completed that program.

Prior to her graduation from P.O.S.T. Level One training, plaintiff learned that Deputy Brett Hardaker, a male, had been assigned as her trainer in Phase IV.  During either her Phase II or Phase III training Ms. Admire overheard Deputy Hardaker tell Deputy Palazzo that "he did not think that females should be on the road."  Doc. 147 -7, p. 111-112.  She also "overheard a conversation between Hardaker and FTO Palazzo that they wanted to wash me from the program."  Doc. 74-3,

p. 9.  After being assigned to Deputy Hardaker, Ms. Admire became concerned that he  would

"wash" her from the program.  Doc. 147-7, p. 115.

On the March 30 DOR, Deputy Hardaker gave Ms. Admire a "1,"  the lowest possible rating,

for "Officer Safety:  General" and "Officer Safety: Suspects/Sus.Pers/Prisoners."  He recorded that

> during a traffic stop . . . the recruit violated . . . by allowing the driver
> to pace about freely during the stop.  The recruit also failed to stop
> the driver from returning to his vehicle, opening the drivers door and
> standing momentarily in the door way.  These events took place after
> the driver appeared to be highly agitated and repeatedly placed his
> hands into his pockets.  The recruit also violated . . .  by failing to
> keep the violator in sight.  This offense occurred when the recruit was
> attempting to retrieve paperwork from the patrol unit trunk and the
> driver returned to the drivers door of his vehicle after being instructed
> to stand at the rear of the vehicle.  At the time, there was nothing
> preventing the driver from entering the vehicle and fleeing or
> retrieving a weapon from with in the vehicle.
>
> The recruit violated officer safety principles as listed above.  The
> recruit also failed to pat down or handcuff the driver which, given his
> behavior and failure to follow instructions would have been justified
> and appropriate.  All events listed . . . were documented on tape and
> submitted to the FTO supervisor.

Doc. 5-9, Defendant's Exhibit M, D.O.R. #38.

The next day Deputy Hardaker again gave Ms. Admire a rating of "1" for  "Officer Safety:

General" and "Officer Safety: suspects/Sus.Pers/Prisoners."  He also noted the following concerning

Ms. Admire's performance during a traffic stop:

> As the driver stood at the front of patrol unit near the license plate
> mount, the recruit positioned herself near the front drivers side tire,
> close to the bumper.  The recruit assumed a bladed stance, how
> ever[sic] she stood with her gun . . . forward, facing the driver.  After
> several seconds the recruit realized her error and repositioned herself
> into a proper stance.  After the driver returned to the vehicle to
> retrieve his paper work, the recruit positioned herself behind him , at
> the vehicles trunk, and conducted a Terry pat down of the subject.
> During the course of the pat down, the recruit removed a cigarette

> pack from one of the subjects pants pockets.  After completing the pat
> down, the recruit made the decision to look inside of the a fore
> mentioned [sic] cigarette pack.  At the time the driver was still
> standing at the rear of the vehicle with his hands on the trunk.  The
> recruit then stepped from behind the driver and stood to his
> immediate left, virtually shoulder to shoulder, with what appeared to
> be less than one foot of separation between her and him.  While in
> said position, the recruits feet were approximately shoulder width
> apart, and she was not in a proper "interview stance."  The recruits
> right hip, along with her weapon, were with in [sic] easy reach of the
> subject's left hand and, as her hands were occupied inspecting the
> cigarette pack, no weapons retention was being applied.  The recruit's
> attention also appeared to be focused on the contents of the cigarette
> pack and not on the drivers actions.

Doc. 65-9, defendant's Exhibit M, D.O.r. #39.  Deputy Hardaker also commented "[d]ue to the

nature and frequency of Deputy Admires officer safety violations, it is this FTO's opinion that she

be terminated from the Field Training Program, effective immediately.  Because the recruits [sic]

repeated violations involve improper body positioning and lack of weapons retention, it is further

recommended that she not be re-assigned in any capacity which would require carrying a firearm."

*Id.*

Deputy Hardaker also completed an Officer Safety Violations form for the violations noted

above, i.e, failing to maintain a safe distance when interviewing persons, permitting the driver to

stand with his hands in his pockets, standing to the driver's immediate left, thereby exposing her

weapon to the driver, and "not applying any weapons retention or focusing on the suspects action."

Doc. 65-10, Defendant's Exhibit N, March 31, 2005.   Ms. Admire disputed two of those officer

safety violations.  She noted on the Officer Safety Violation form that she advised the driver to keep

his hands out of his pockets and that she allowed him "to place his cell phone in his pocket and

retrieve it on several occassions [sic]  in an attempt to locate a ride.  *Id.*  With respect to Deputy

Hardaker's notation that Ms. Admire exposed her weapon to a suspect and was not focused on the

suspect's actions, Ms. Admire noted on the Officer Safety Violation form that "[a]ccording to the DOR the FTO states it 'appeared' there was another deputy on scene and I request that he be questioned regarding the situation.  I contest that this is incorrect and this did not occur.  The incident is reported as it 'appeared' to the FTO from the passenger seat of the vehicle."  Doc. 65-10

On April 4, 2004, as a result of her documented officer safety violations, Ms. Admire was placed on two days suspended  administrative leave.  Thereafter on April 6, 2004, at a  meeting attended by Major Donald Sharp, the supervisor of the three Criminal Patrol Divisions of the STPSO,  Captain Tim Lentz, the Commander of Criminal Patrol District II,  and Captain Donna Schlesinger, Director of Human Resources for STPSO, Ms. Admire was advised that  Deputy Hardaker had  recommended  that she be terminated from the FTO Program and that  Scott Knight, a supervisor with the FTO Program  concurred in that recommendation.  Defendants submitted evidence that Major Sharp offered Ms. Admire the option to transfer to a division other than the Criminal Patrol Division or to attempt to complete the program, but advised her that if she elected to attempt to complete the program that she would be terminated from the FTO Program and the STPSO if she received another officer safety violation.  Doc. 65-5, Exhibit A, p.5, Doc. 65-6, Exhibit J, p. 6, and Doc. 65-7, Exhibit K, p. 7.  Ms. Admire elected to remain in the program. Apparently at Ms. Admire's request, Major Sharp offered Ms. Admire eight hours of remedial training with respect to officer safety which she accepted.  Major Sharp and Captain Lentz both stated in their affidavits that Major Sharp offered Ms. Admire the opportunity to continue Phase IV with a different trainer,  but that Ms. Admire elected to remain with Deputy Hardaker. Doc. 65-7, Defendant's Exhibit K. p. 7, Doc. 65-6, Defendant's Exhibit J, p. 6.  Ms. Admire denies that she was offered the opportunity to continue in the FTO Program with a trainer other than Deputy Hardaker.

On April 8, 2004 Ms. Admire participated in eight hours of remedial training with Sergeant Mark Arroyo and Deputy Shellie McCloud.  Doc. 65-11, Exhibit T.   Thereafter she returned to training with Deputy Hardaker.  On April 9 Deputy Hardaker again gave Ms. Admire a rating of "1" on "Officer Safety: General" and "Officer Safety: Suspects/Sus. Pers./Prisoners" on her DOR. Doc. 65-11, Defendant's Exhibit V.  Deputy Hardaker provided specific reasons for his low rating of Ms. Admires officer safety evaluation, stating on the Officer Safety Violation form, in pertinent part:

- "On a traffic stop, event #040439, the recruit advised central dispatch that the location of stop was Gause Blvd when in fact it was Carnation St. off Hwy 190 W.  The recruit failed to provide dispatch with a vehicle description or number of occupants.  Said stop is documented on video tape."
- "While on traffic stop, event #2005-040262, the recruit stood at the drivers door in a lane of traffic while obtaining the drivers information and issuing her a citation.  The recruit failed to use the patrol unit properly and create a safe lane of travel. While returning to the patrol unit a vehicle passes the recruit at an unsafe distance.  This stop is documented on video tape."
- "On a traffic stop, event #2005-040414, the recruit advised dispatch that the stop was on Gause Blvd when it was on Sixth St. near Florida.  Said stop is documented on video tape."
- "On a traffic stop, event #040341, the recruit failed to carry her flash light.  The stop was conducted at 0051 hors in a poorly lit parking lot on a vehicle with heavily tinted windows.  Said stop is documented on video tape."
- "While responding to a domestic disturbance, event #2005-040305, the recruit failed to carry her flashlight.  The call was investigated at 2033 hrs. on a poorly lit rural residential road. Prior to arrival, central dispatch advised that the husband was threatening to hit the wife with a stick and that he carries a pocket knife.  FTO had to provide illumination.  Call recorded on tape."

Doc. 65-11, Defendant's Exhibit U.  Thereafter Ms. Admire was terminated from the FTO Program and as a STPSO employee.

1) Title VII Termination Claim

Plaintiff claims that her termination resulted from gender based discrimination and that similarly situated males were not discharged for similar of more egregious conduct.  **Ms. Admire offers Deputy Hardaker's statement that "women should not be on the road" as proof of gender discrimination.  To determine whether plaintiff's claim is properly analyzed under *McDonnell Douglas* or *Price Waterhouse*, the Court must determine whether there is a genuine issue of fact concerning whether the statement attributed to Deputy Hardaker qualifies as direct evidence of discrimination.**

**As noted herein above, a comment in the workplace may provide sufficient evidence of discrimination if it is 1) related to the protected class of persons of which plaintiff is a member; 2) proximate in time to the termination; 3) made by an individual with authority over the employment decision at issue, and 4) related to the employment decision at issue.  *See Krystek v. University of Southern Mississippi*, 164 F.3d at 256.  The statement clearly relates to women.  Ms. Admire's  allegation  that Deputy Hardaker made the statement while she was in either Phase II or Phase III of her training establishes the temporal requirement for direct evidence.  It is undisputed that Deputy Hardaker recommended that plaintiff be terminated from the FTO Program.  Although he was not the ultimate decision maker, there is no evidence establishing whether the ultimate decision maker  independently determined that Ms. Admire should be terminated or whether he simply "rubber stamped" that recommendation.  Because there is a question of fact concerning whether the ultimate decision maker based his**

decision to terminate Ms. Admire on his independent assessment of the situation or whether he relied on Deputy Hardaker's recommendation, the Court concludes that there is a genuine issue of material fact concerning whether there is direct evidence of discrimination. *See Long v. Eastfield College*, 88 F.3d 300, 307 (5th Cir. 1996). Therefore, the Court will analyze plaintiff's termination claim using the *Price Waterhouse* analysis.

Because plaintiff produced direct evidence of discrimination, the burden of proof shifts to defendants to demonstrate that plaintiff would have been terminated regardless of discriminatory animus.  The defendants have produced overwhelming evidence of Ms. Admire's numerous and continuing officer safety violations.  They have also produced evidence that during Phase IV of her FTO training she consistently scored a "1" in both areas of officer safety.  They have also offered  undisputed evidence that at least seven women have successfully completed the FTO Program and that during Captain Lentz's "tenure as commander of various districts of the Criminal Patrol division" and Major Donald Sharp's term as supervisor of the Criminal Patrol Ms. Admire is the only female who has failed to successfully complete the FTO Program.  Doc. 65-6, Exhibit J., p.3, Doc. 65-7, Defendant's Exhibit K, p. 4 Considering the record as a whole, no rational trier of fact could find for the plaintiff on her claim of discriminatory termination; defendants are entitled to summary judgment on this claim.

Moreover, assuming *arguendo* that Deputy Hardaker's statement that "women should not be on the road" is not direct evidence of discrimination and that plaintiff's termination claim is properly analyzed under the *McDonnell Douglas* analytical framework, defendants are nonetheless still entitled to summary judgment.  As with her other Title VII claims, to

28

establish a prima facie case of unlawful discrimination with respect to her termination plaintiff must establish a *prima facie* case demonstrating 1) that she is a woman; 2) that she suffered an adverse employment action, and 4) that persons who were not in the protected class were treated more favorably. *Ross v. University of Texas at San Antonio*, 139 F.3d at 526. Defendants do not dispute that plaintiff satisfies the first three prongs of the *prima facie* test.

Defendants have provided considerable evidence demonstrating that during Phase IV Ms. Admire consistently scored received the minimum score with respect to both categories of officer safety. Ms. Admire has not identified any male participant in the FTO Program who was similarly situated to her in terms of actual performance with respect to officer safety who was treated more favorably. Ms. Admire does identify several males who she alleges received additional training and were permitted to repeat training in Phase II and Phase III; however, she submits no evidence establishing that these male deputies were consistently rated well below a "4" with respect to officer safety, a primary concern of the FTO Program. Similarly, although Ms. Admire urges that she was discriminated against because her trainers did not review her training evaluations with her daily, Ms. Admire has not identified any male trainees whose trainers reviewed their training evaluations with them on a daily basis.

Additionally, while Ms. Admire disputes a number of the violations and contends that Deputy Hardaker evaluated her more critically because of her gender, she offers no evidence challenging Deputy Hardaker's evaluations of her performance or his criticisms of Ms. Admire's acts or omissions with regard to officer safety. That lack of evidence is especially significant because a number of the officer safety violations documented on March 30, 2005 and April 9, 2005 are on videotape, and therefore apparently available for review of the validity of Deputy Hardaker's

criticism of plaintiff's acts and omissions.  Instead, to establish that Deputy Hardaker evaluated her more harshly than male trainees were evaluated , plaintiff relies on  Deputy Hardaker's statement that "women should not be on the road" and the conversation she overheard between Deputy Hardaker and Deputy Palazzo that "they  wanted to wash me from the program." **Considering the evidence as a whole, plaintiff has not created a fact issue as to whether each of defendants' stated reasons for terminating plaintiff actually motivated the employer, nor has she created a reasonable inference that her gender was determinative factor in her termination.** Defendants are entitled to summary judgment on plaintiff's Title VII claim of discriminatory termination.

<u>2) §1983 Claims for Termination</u>

In her second amended complaint, plaintiff alleges:

> B. That when defendant terminated the plaintiff's employment and terminated the plaintiff from the FTO program, the defendant violated the plaintiff's constitutional rights to equal protection under color of law based on the deficiencies in implementation and evaluation in training which used arbitrary, subjective and capricious standards vis a vis males and females in that:

>> (I)  The plaintiff was denied an equal opportunity to receive training vis a vis males.

>> (ii) The defendant's FTO program is inadequate in design, implementation and evaluation components as presently constructed and has an adverse impact on females based on negligent design, negligent implementation and negligent evaluation components, and unequal administration.

Doc. 17.

Plaintiff's  allegations concerning the deficiencies of the program are broad, e.g., that she was harshly evaluated prior to being provided with adequate training of the correct way to patrol ,

that unlike herself, some males were allowed to remain in training for as long as it took for them to be successful in the program; and that male trainees who were dissatisfied with their training officers were permitted to transfer to other trainers, an opportunity she alleges she was denied. Plaintiff has failed to provide sufficient evidence to raise a genuine issue of material fact as to whether male trainees who received more favorable treatment

Plaintiff identifies Steve Peretti, Chris Rivere, Tim Cole, and Matt Cleland as trainees who were given multiple opportunities to retrain, change trainers or change training districts. Significantly, defendants do not deny that male trainees were given multiple the opportunity to repeat training phases and to change trainers.[4] Thus, Ms. Admire has established a *prima facie* case.

Defendants contends that Ms. Admire's termination resulted from her poor performance in Phase IV, specifically her unacceptable record for officer safety. Defendants have offered considerable evidence establishing Ms. Admire's extensive history of officer safety violations. Ms. Admire's numerous officer safety violations are a legitimate nondiscriminatory reason for her termination.

To establish that the officer safety violations are a pretext for gender discrimination, plaintiff relies on Deputy Hardaker's statement that "women should not be on the road" and challenges the validity of the alleged violations urging that the violations resulted from Deputy Hardaker's unduly harsh evaluations of her. As noted above, plaintiff has not offered any competent evidence substantiating her contention that the officer safety violations cited by Deputy Hardaker were not

---

[4] In fact, the affidavits of Major Donald Sharp and Captain Tim Lentz, establish that Ms. Admire was offered the opportunity to complete Phase IV with a trainer other than Deputy Hardaker. Plaintiff denies that any such offer was made.

valid criticisms of plaintiff's performance.  Moreover, Deputy Hardaker's isolated comment on women does not constitute substantial evidence of pretext under the facts of this case.

Nor can plaintiff prevail on her discriminatory termination claim under her theory that the FTO program has a discriminatory impact on women.  Plaintiff offers no evidence of the impact of the program on women other than her own termination from the program.  Defendant however offers substantial evidence establishing that the program as designed and implemented does not have an adverse impact on women.  The affidavit of Captain Tim Lentz states that during his "tenure as commander of various districts of the Criminal Patrol division, Ms. Admire is the only female deputy to have begun the division's FTO program who has failed to successfully complete it."  Doc. 65-6, Exhibit J, p. 3.  He also states that he is aware of at least seven women who have successfully completed the program and eight males who have not successfully completed the program during the same time frame. *Id.*  Major Sharp also filed an affidavit attesting to the fact that during his term as supervisor of the Criminal Patrol Ms. Admire is the only female deputy to have failed to successfully complete the FTO Program.  Doc. 65-7, Defendant's Exhibit K, p. 4.  He states that he knows of ten women who completed the program successfully and in that same time frame is aware of at least fifteen males who did not successfully complete the program.  *Id.* Defendants are entitled to summary judgment on plaintiff's claims of discriminatory termination under §1983.

## D) Claims  of Retaliation

Plaintiff asserts that defendants terminated her from the FTO Program in retaliation for having filed  an EEOC claim alleging gender discrimination manifested by refusing to promote her and by the imposition more harsh discipline than that imposed on male deputies, "for having filed a federal lawsuit, for having made numerous challenges to the defendant's policies, and because she

32

was considered to be a problem for the department." Doc. 67, p. 11.   Ms. Admire offers no direct evidence of retaliation.  To establish a claim of retaliation relying upon circumstantial evidence she must show: (1) that she engaged in a statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action.  *Evans v. City of Houston*, 246 F.3d 344, 352 (5th Cir. 2001).

Plaintiff's  filing of a claim with the EEOC and her subsequent  filing of this  suit clearly constitute protected activities.  *Casarez v. Burlington Northern/Santa Fe Company*, 193 F.3d 334, 339 (5th Cir. 1999). Defendants do not dispute that plaintiff suffered an adverse employment action. Thus, the viability of this claim  rests upon whether plaintiff has established a causal connection between her  protected activity and  her termination.   "A 'causal link' is established when the evidence demonstrates that 'the employer's decision to terminate was based in part on knowledge of the employee's protected activity.'" *Medina v. Ramsey Steele Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001) *quoting Sherrod v. American Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998).  "[A] plaintiff need not prove that her protected activity was the sole factor motivating the employer's challenged decision in order to establish the 'casual link' element of a prima facie case." *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001)(internal quotation and citation omitted.)

It is undisputed that Donald Sharp and Captain Tim Lentz, were  aware that Ms. Admire had engaged in protected activity.  However, plaintiff points to no evidence demonstrating that the decision to terminate her was based in any way on that knowledge.  Plaintiff produced evidence establishing nothing more than knowledge of protected activity by  the ultimate decisions makers and that she was terminated.

Plaintiff attempts to establish the requisite causal connection link based on the temporal

proximity of her termination to the filing of the EEOC claim and this suit. "[T]he mere fact that some adverse action is taken *after* an employee engages in protected activity will not always be enough for a *prima facie* case." *Roberson v. Alltel Information Systems*, 373 F.3d at 655. However, "[c]lose timing between an employee's protected activity and an action against [her] may provide the 'causal connection' required to make out a prima facie case of retaliation." *Evans v. City of Houston*, 246 F.3d at 354. Contrary to plaintiff's assertions, she was not terminated within three months of filing this action and within five months of filing her claim with the EEOC. Ms. Admire filed her EEOC claim in March 2003 and this suit in February 2004. Her April 2005 termination occurred more than thirteen (13) months after this suit was filed and at least twenty three (23) months after she filed her EEOC action. The lapse of such an extended time between the protected activity and plaintiff's termination fails to establish the requisite causal connection. *Cf. Jackson v. RXO Bottlers of Toledo,* F.2d 50, 54 (6th Cir. 1986) (occurrence of one year lapse between protected activity and adverse employment action "militates against a finding" of causal connection).

**Moreover, plaintiff concedes that during   April 6, 2005 meeting with Major sharp, Captain Lentz, and Donna Schlesinger she was offered the option to another position within the STPSO, but declined the transfer in order to continue with the FTO Program. The offer to transfer Ms. admire to another position within the STPSO militates against a finding of retaliation.**

The Court need not determine whether plaintiff's self-described "challenges to defendant's policies" qualify as protected activity because even assuming arguendo that they do constitute protected activity, plaintiff has not established a causal connection between those challenges and her termination. *See Ramirez v. Gonzales*, 225 Fed. App. 203, 210 (5th Cir. 2007). Because plaintiff

has failed to produce *prima facie* evidence sufficient to allow a trier of fact to conclude that she was terminated in retaliation for her protected activity, defendants are entitled to summary judgment on plaintiff's claim of retaliatory termination.

Plaintiff also appears to urge that while assigned to the jail she was the victim of retaliation due to the filing of her EEOC complaint, her appeal of her disciplinary action to the Administrative Review Board, and her success at halting her transfer to a different work shift.[5] Plaintiff has failed to establish a *prima facie* case of retaliation based on those activities. Plaintiff has not identified any adverse employment action suffered as a result of those activities while employed at the jail. Arguably plaintiff may contend that she was denied promotion as a result of her challenge to her disciplinary action; however, she offers no evidence of a link between being denied promotion and having challenged the severity of her disciplinary action. Nor has plaintiff submitted any evidence establishing a causal connection between her protected activity while employed at the jail and her termination.[6] Defendants are entitled to summary judgment dismissing plaintiff's claims of retaliation while she was employed at the jail.

### E) Claim of Hostile Work Environment

It is unclear whether plaintiff continues to urge a claim for hostile work environment based on her gender. Nevertheless, in the interest of judicial economy the Court addresses such a claim.

---

[5] For purposes of this motion the Court assumes *arguendo* that challenging a change in work shifts constitutes protected activity.

[6] Additionally, the Court notes that plaintiff submitted no evidence establishing that any ultimate decision maker with respect to her termination knew of her appeal of the her disciplinary sanction or her success in preventing a shift transfer.

To prevail on a claim of hostile work environment a plaintiff must prove that: (1) she belonged to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on gender; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). Where the plaintiff contends that the harassment is "committed by a supervisor with immediate (or successively higher) authority over the harassment victim, the plaintiff employee needs to satisfy only the first four elements" of the test for hostile work environment. *Celestine v. Petroleos De Venezuella SA*, 266 F.3d at 353. Harassment affects a term, condition, or privilege of employment when it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed. 2d 295 (1993). In determining whether a work environment is hostile or abusive, the Court must evaluate the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the employee's work performance." *Id*. at 23, 114 S.Ct. at 371.

Plaintiff appears to rely on the following acts and statements in asserting that she was subjected to a hostile work environment:

- Marlin Peachey's destruction of her promotion records;
- Marlin Peachey's statement that he "wanted to get of" her;
- Marline Peachey's statement "[g]ood. She won't be here at the jail no more. She won't be my problem anymore and they can get rid of her on the road" after learning that she had been accepted to the FPO Program; and
- Marline Peachey's order that plaintiff be videotaped leaving and entering the building.

The acts and statements relied upon by Ms. Admire are not frequent, physically threatening, or

humiliating.  Nor is there any evidence that the complained of acts or statements interfered with or adversely affected Ms. Admire's performance.  Plaintiff has failed to establish the third prong of her *prima facie* case.  Therefore, the Court need not analyze the remaining prongs.  Defendants are entitled to summary judgment on plaintiff's discrimination claim of the hostile work environment.

### F) Claims against Scott Knight

In the Second Amended Complaint plaintiff named as a defendant "Scott Knight, In Official Capacity as FTO Manager" and alleged that he was "liable to the plaintiff for failure to adequately supervise the field training; failure to adequately implement objective training and evaluation standards, and for failing to assure equal treatment in all aspects of the FTO between males and females."  Scott Knight moves for summary judgment on the claims pending against him contending that he was not a genuine decision-maker or supervisor regarding Ms. Admire's participation in the FTO Program, "at least as to the subject of her complaint" and that his participation with Ms. Admire was limited to compiling and passing along paperwork to Captain Tim Lentz, the supervisor of the FTO Program and the person who made the ultimate decision to terminate plaintiff from the FTO Program.  Doc. 65-3, p. 24.  Because the Court has dismissed all of plaintiff's claims with respect to the FTO Program,  Scott Knight's motion is denied as moot. Accordingly,

**IT IS  ORDERED** that plaintiff's claims of retaliation against all defendants be dismissed with prejudice;

**IT IS FURTHER ORDERED** that plaintiff's claims for gender discrimination related to disciplinary action be dismissed with prejudice;

**IT IS FURTHER ORDERED** that plaintiff's claims for hostile work environment be dismissed with prejudice.

**IT IS FURTHER ORDERED** that plaintiff's claims against all defendants for gender discrimination for failure to promote her in connection both November 3, 2003 promotion boards be dismissed with prejudice;

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment be DENIED to the extent that it seeks to dismiss plaintiff's claim against for gender discrimination for failure to promote her in connection with the July 26, 2003 promotion board and the sergeant vacancy announcement; and

**IT IS FURTHER ORDERED** that plaintiff's claim for gender discrimination related to her termination be dismissed with prejudice.

New Orleans, Louisiana, this 24th day of June, 2008.

_____

STANWOOD R. DUVAL, JR.
UNITED STATES DISTRICT JUDGE